and PDVSA Petroleo, S.A. of Belen. Mr. Perla, for the Belen. Mr. Rosen, for the Epo. Good morning. Good morning, Your Honors. Juan Perla of Curtis Millay, with the PDVSA defendants. I may please the court. I reserve three minutes for rebuttal. I'm having a little trouble here. I'll try to speak closer. I'm sorry. I'm sorry.                The district court's decision on jurisdiction under the FSIA is riddled with legal errors, some thornier than others. But there is a related issue that would do away with the entire case, any remaining claims, in one fell swoop, and that is the act of state doctrine. So I'd like to start there. Before you start there, could you start with why we have jurisdiction to hear that issue? Well, Your Honor, you have pending appellate jurisdiction when there is an appeal from a denial of sovereign immunity, which is what is happening here, to decide the act of state doctrine. That happened in the Agudas decision, where the court considered in passing whether the act of state doctrine might apply and thought that it was appropriate to do so. You also have the... That's a drive-by. Your Honor, I would agree it is a drive-by. But I think that the principle stands, insofar as the act of state doctrine is bound up with the concept of sovereign immunity. You have a strong argument that the issues are related.  Kagan-Looper and 1605A3 have a common history. One might bear on the other, but that's a convenience point. You don't need to get into act of state in order to give you a full and fair review of the immunity question that you're entitled to appeal. Well... The Supreme Court has warned us not to be loosey-goosey in expanding appeals just for the sake of convenience. Well, I think it's more than convenience here, because Your Honor is correct that Section 1605A3 and the second Hickenlooper Amendment, especially after the Supreme Court's decision and assignment, clearly share a common history. And it's relevant to look at both, and it's proper, I think, to look at both, and this court has done it previously. Are you saying that we would have... We just applied the factors from SWIMP, which is intertwined, and it's strictly intertwined. Would that apply here, given that you have the common question of a violation of international law in both the FSIA and the act of state? Yes, I think that's one of the basis on which the immunity issue is intertwined with the act of state doctrine, because you're looking at a situation in which there is a violation of international law. And you're also... Could you establish penitent jurisdiction under SWIMP, as opposed to our precedent, which has gone beyond the two factors identified in SWIMP? Yes, I think there is, under SWIMP, the interrelation that you pointed to already. But also there is an issue in this case as to whether the property being in the United States is still relevant, in terms of the Pena Vesa defendants being alter egos, as opposed to separate legal persons. So, which is part of the argument and the interpretation of the Second Hickenlooper Amendment as to where the property is. So these issues are bound up. You also have the judicial efficiency considerations to look at. In Helmrich II, which my friends on the other side point to, the court eschewed the issue of the act of state, because there were still sovereign immunity issues left to litigate on remand, and there were still other merits issues to consider that could alter or moot the analysis for the act of state doctrine. That's just not the case anymore. The sovereign immunity decisions have been decided, and there's nothing left that would change the analysis of the district court. The district court also hadn't made a decision in Helmrich II yet on the act of state. It has now. And under the Halabi decision, which we have cited in our reply, it makes sense to go to the act of state doctrine first, if there are more complicated, maybe thornier issues that subject matter jurisdiction analysis would require. There, it was the statute of limitations issue, which is a threshold- It's a different... I mean, one question is whether we have pendant jurisdiction, but is your argument that... Because act of state is a merits question, so normally we would have to decide jurisdiction before... Just because we have pendant jurisdiction doesn't mean we can reorder our resolution of issues from what's normally required, which is jurisdiction before you get to merits. Is your argument that we can skip over jurisdiction altogether and decide that merits question? Well, in Halabi, this court looked at that procedural process and satisfied itself that it had Article III jurisdiction, which was the fundamental jurisdiction that the court needs in order to act, and looked at statutory subject matter jurisdiction, which is what we're looking at here with the Foreign Sovereign Immunities Act, and said, we can go directly to a threshold merits defense that would actually advance the objectives of sovereign immunity because it would end the litigation. And I think that the act of state doctrine in this case acts in the same way. It is intertwined. It is bound up. If we are right about the act of state doctrine, then the case goes away, and this case has been lingering for more than 10 years, dying a slow death. And I think it's time to put an end to it, and the act of state doctrine would allow the court to do that and avoid all these other thornier issues. Because in your position, we could decide act of state without deciding jurisdiction first? That is what the court did in the Halabi case, yes, in terms of a merit, a threshold merits defense, just like a statute of limitations. Is that because you think for Steele Co. purposes, we can skip over statutory jurisdiction as opposed to Article III standing? Or is it because you think the act of state doctrine is kind of threshold and non-merits? No. Or other threshold grounds that don't fully get subject to the Steele Co. order? The former, Your Honor. There's no doubt here that there's a case or controversy. So there is clear Article III jurisdiction. And in Halabi, the court said we can skip over subject matter jurisdiction, assume- A lot of controversy on that question. Well, Your Honor, I think that in the- Keep the circuit split. Some of us think that's pretty indefensible. Well, while I think that Halabi is defensible, I will, if you would like, look at the subject matter jurisdiction issue because there's plenty to criticize about the district court's decision on that front as well. So we'll take the primary issue on sovereign immunity and jurisdiction here, which is, has there been a property right that has been identified? And we think the fundamental error from which everything else goes wrong in the district court is the confusion and conflation between the ownership interest to the company and the assets of the company. What was taken here and what has been alleged to have been taken here is the rigs, the wrenches, the trucks, everything that was used to support the rigs. And the rigs were property of the Venezuelan corporation, H&P Venezuela. Now you don't dispute the general rule from Helmerich and I think Exxon that at some point taking the stuff of the foreign sub can deprive the sub of so much economic value that the shareholder has an international taking claim, right? Well, I would say that it's not about the value alone and certainly not just the profits that the Venezuelan corporation... Permanently take over management and control and completely destroy share value. You don't dispute that legal point. No, I think the test in Helmerich 4 is the test that we should be looking at. And now you're just fighting the district court's fact finding on whether this taking rose to that level. No, it's more than that because I think that the district court fundamentally misunderstood what the test requires and therefore misapplied the facts to determine and the evidence to determine whether the test was satisfied. And the fundamental error again is in conflating this nebulous concept of business with what the property right that is actually at issue. The property right is the ownership interest. I take the court to the Exxon decision. In the Exxon decision... Okay, so why can't we conceptualize this as they've taken the ownership interest of the parent company and now they're owning and operating that ownership interest? Because there has been no factual finding and there is no evidence that the ownership interest has been taken or is being owned or operated by anyone in Venezuela. HIPP... You have to take the shares though. They render the shares. I mean, if that's your point is, yes, they still hold their certificates, their pieces of paper. They give them shares in the company. That's not the test. The test is, and this is proposed by the United States in this brief as well, is whether they have rendered the value, the economic value of those shares zero or essentially zero, worthless. And that happens by taking all the operating capacity of the business away so they can't function. That's why the district court was talking about racism. What this company did to make value for shareholders was drill. And all of that was taken away and management was taken away and all control over operations was taken away. All profits taken away. I don't think that's, I don't think the district court found that they lost a property interest in the race. They lost everything it was in this company that gave those shares economic value. HIPP... Do you agree with that factual finding by the district court? Well, the facts are not disputed. I think the conclusion that the district court drew from those facts is what is problematic because the entire, but first of all, there is management and control of the company. It's not just paper shares that have been left. They still have all the voting rights. They appoint directors and that allows them to...  It's not function. It's not, I can't, it's not doing any business. I can't do any business. They can't do it. It's just a shell. But, well, on day one, after the expropriation, they had $30 million in cash. They had more than $25 million. The district court went through all those as to why that's not real money. So those, again, are fact issues that I don't think you've argued for clearly erroneous. So, I mean, did you put on any evidence as to the market value of the shares that Hellermark International holds in this company? Or say it was an individual stockholder. What is the market value of their shares? Well, that would not be our burden, but they have not put forward any evidence. I think they have. That it's worth, let's say, they get no money. They get no, there's no profits, there's no dividends, there's nothing. Well, their corporate witness said that he had not done, they had not done an evaluation of what the shares were worth. And the problem is that that's a fundamental problem if you're going to look at the beneficial and productive value of the shares, because- Is your argument that these shares are worth something on an open market? They could be. And certainly- What if they are? Well, but we know that there, at least, there were $30 million there. There were $22 million in insurance claims that were obtained as a result of their ownership interests in H&P Venezuela. They had the ability to pursue legal actions here in this court. And what's the value of the shares that they get insurance payment for their property haven't been taken from them? Someone could buy the company in order to pursue the legal action. I mean, if I get a payment from an insurance company because my car was totaled in an accident, that doesn't mean the car has any value left in it, does it? Well- Does it? Does it? It could. Well, and that's- That's basically how insurance works here. There's no value left in that car. It's just compensation. Sure, but that compensation goes back to the company, and then the shareholder, through its ownership interest in the company, is able to extract that value from it. And the company continues to exist, and they treat it as something that has strategic value because they continue to- Do you think this appeal turns on whether the shares have value? Your Honor, I don't think it turns on whether the shares have value. Okay, but there are two parts of the statute. One is whether the rights and property were taken in violation of international law. And part of that is you take the shares if you reduce their value to zero. And the second part of the statute says it has to be owned or operated by an agency or instrumentality of the foreign state. And so I think the second part is the more interesting issue for purposes of this appeal because I don't know that the value of the shares goes to whether it's being owned and operated by the agency, but it still seems clear to me that if they've taken over everything that this subsidiary does, they're owning or operating the ownership interest that the parent company had. I think that the district court's decision on the narrower claim under Venezuelan law is where the crack in the logic is exposed because the district court there realized that what they had was a shareholder right to dispose of in terms of what the district court said. And the court understood that that was derivative. That's a separate claim though. But on the claim on the ownership interest, they're still owning and operating the ownership interest by controlling the subsidiary and the asset subsidiary. Well, HMPIDC is the one that owns and controls the ownership interest because they're the ones that reported on their balance sheets. They're the ones that use HMPB to litigate in this case, to litigate in Venezuela, to litigate in the arbitrations for the insurance claims. They are the ones that have been keeping it up to date with its licensing requirements, its tax payments in Venezuela. They're keeping this company alive. So you think this appeal does turn on whether they've taken the ownership interest? It has to because that's... If they've taken it, they're definitely operating it, owning and operating it. Correct. Well, when you look at... No, I don't think that's right. In terms of destroying the ownership interest, perhaps, and I don't think that's right because of the reasons I've said, but then when you get to the owner operated, the only thing that the district court could point to was the rates. And the problem with allowing the district court's decision to stand here is that it eviscerates the domestic takings rule. And the US government, when it submitted its supplemental brief that formed the basis of the test that we now have, said, you have to look at an indirect taking in light of the domestic takings rule. Because if you just focus on the value in the company without looking at whether under international law, the company continues to exist and you have the ability to control and manage the ownership interest, then you can convert any kind of taking of assets of a company into the taking of the actual ownership interest. And in Exxon, this case, actually, this court... That's not right. It's only takings that are so dramatic that they almost entirely destroy the value of the enterprise. Well... You take lots of things that don't rise to that level. But if you don't take... Domestic takings. If you don't take the company itself, which is what Helmreich-Fors said, you do not have an indirect expropriation of the ownership interest. You have to exclude the shareholder from its business, its company. And that's important because if you don't distinguish clearly what... Sorry. Your theory is that if the shell of the company is left, right? So you take all of its assets, its employees, its business, control and management, you empty it out. So all you have is a sort of shell of a building that's left there, maybe the name of the company. Your argument is that is insufficient to establish that the shares have been rendered valueless. Under customary international law, if the company continues to exist, and this is what Barcelona Traction said, even if you leave it defunct, if the company continues to exist, international law only cares about the ownership interest that the shareholder has.  The ownership interest is zero. Even if the company... The fact that the company name and shell is sitting there doesn't address the issue of whether the value of the shares... That's what's been taken here, is the value of the shareholders and the company, and that's been reduced to zero. But Your Honor, the value is not a property right. The property right is the ownership interest that is represented by the ownership of the company. So that's what reduces zero, right? The company is sort of sucked up completely by the government. Otherwise, your argument would leave nothing, would leave nothing to this theory that the United States has endorsed, that we recognized in prior Helmholtz decisions, that when shares are rendered valuable, because all the foreign government has to do is not take the company name, right? That the company still exists. That empties, it makes it all a charade. Well, Your Honor, it's not a charade, because that's not what happened here. No, I'm asking you about your theory. You just said, as long as we don't take the company itself, so we leave it its name, maybe we leave the empty building sitting there, then everything's fine. It's just a domestic taking. That's not what we said in Helmholtz 4, that's not what the United States said in its brief, but I'm asking you directly, is that what your position is? No, Your Honor, that is not our position. That's what it sounds like to me when you say we didn't take the business. What do you mean by we didn't take the business? What Venezuela did was take rigs. The expropriation decree talks about the- It's way more than that. It took all the equipment, it took the employees, it's managing it, it's using that equipment. There's nothing left for Helmholtz Venezuela to do, its entire business operation, which obviously it was a heavy equipment operation, but it was more than that, it was employees, it was a business plan, it was a model of producing profits. It was probably contracts for providing this service, all gone. You're saying that we didn't take the company, the company's still there, what do you mean by the company's still there? The ownership interest, their ability to use the company to pursue claims, to maintain it ready to go in case there is an opportunity to operate. It's completely valueless, but they keep the name of the company, it's copyrighted at this point, and so they keep the name of the company, and shares are utterly valueless, they're just hoping and praying that maybe there'll be a change in government, and that means they don't have any claims? Your Honor, I see my time is up, so I'd still like to reserve some time for rebuttal, I'd like to answer your question. I'll give you time for your rebuttal, I'm just trying to understand what you mean when you say, well, everything's valueless, all the value of this operation has been hoovered up, but we're going to, but you've still got, you still own the company. Well, Your Honor, I don't think the entire value has been taken because they continue to treat the company- That's a factual dispute with the district court. It's not a factual dispute insofar as you have to show that, you still have to show that HOPADC has been permanently deprived of management and control, and that is what's absolutely- Where does permanent come in? From the test, Your Honor, from this court's articulation of the test in Helmrich 4. How long is permanent? Forever. And they have- Well, again, then, this is no test at all. What about what we said in Helmrich 4, we said, if it completely destroys the beneficial and productive value of the ownership, then that would be depriving them of the shares? Just beneficial and productive, it doesn't have to be every single thing. Well, in conjunction with permanently depriving them of management and control, the two things have to be put together in order- Where is that in Helmrich 4? It just says, if you completely destroy the beneficial and productive value of the company, and the remand was to determine whether that had happened, the district court did that. No, Your Honor, actually, the remand reveals that that's not what was the only thing. If you look at Helmrich 4, the articulation of the test from the United States amicus brief, it says, when a state permanently takes over management and control, this is, I believe it would be page- I'm sorry, which brief? This is Helmrich 4, the district court's decision in Helmrich 4, section 3A, which I have my printout here that I can't quite get you the exact page, but it's in the section discussing the broader claim. It's indented where the test is articulated, when a state permanently takes over management and control of the foreign shareholder's business, completely destroying the beneficial and productive value of the ownership of the company, and leaving shares that have been rendered useless, then you have an indirect expropriation of the ownership of that business. So, I'm sorry, so are you relying on the idea that Venezuela's going to give this back, so it's not permanent? Is that what this turns on? What has been taken is the rigs, and that belongs to HNTD. The ownership interest has not been taken or permanent, they have not been deprived of it now or permanently. So, the key feature of the ownership interest is controlling what happens. The subsidiary, and they have no control over the subsidiary, and PVDSA is exercising that ownership and control of the subsidiary. I think part of the confusion, again, is that we're looking at what does HNPIDC have a right to control? They have the right to control the company. Right, including what happens to the subsidiary. But this is where the problem starts to get blurried in terms of the domestic takings rule. If you just look past the company and ignore the fact that they incorporated a Venezuelan entity to do their business, then you're treating the property of the company as the property of the shareholder. And that's why the United States... No, I don't think so. There's a corporate form here. There's a parent company, it has 100% ownership interest in the subsidiary, and part of that interest is to control the subsidiary, and that interest of the parent company has been taken away. And it's being owned and operated by PVDSA. It hasn't been taken away, but it's certainly to the point about... How has it not been taken away? Because they no longer can control the company. That's the key feature of the ownership. Those shares that have no value is not the key feature of ownership. They have the capacity by retaining their own... How do they have the capacity to control what happens in the subsidiary? It's a key feature of ownership. If HMPIDC infused a capital into HMP Venezuela, that capital would not go to the PVDSA defendant. That capital would go to HMP Venezuela. It's a question of how they're controlling the subsidiary. Because they use their shareholder power to be able to do things with the company, like go after the insurance claims, bring a lawsuit in the United States. They use the money, and Venezuela takes that too. That is absolutely not the claim that we're dealing with here. And the cash was left in the bank account. I think you're over-reading the permanence here. I think what it's referencing there is if a government were to temporarily take something to deal with some kind of emergency. I do not read permanence here as like eternity, as you are. Is there any evidence in the record that this is a temporary takeover? For Venezuela to nationalize it, that it now belongs to the Venezuelan people, serves the Venezuelan people? It doesn't sound temporary to me. Well, the temporary... Well, what hasn't been taken, again, and I understand that the panel may not be interested in this view in terms of the ownership interest being still left because their ability to control as a shareholder the actions that the company, that agency, Venezuela takes. But I think, again, if we look at the owner-operated problem, it helps to crystallize what the problem is in terms of what actually was taken. Because when you look at the narrow right, which is a shareholder right, as opposed to the entire bundle of shareholder rights that come from ownership, you look only at what the district court looked at in terms of the voting power or the right to dispose. And the court said, that is derivative because they don't actually own the rigs. Once the rigs changed hands, that right was extinguished and is not owned or operated by the PDVSA defendant. But what if they were wrong? I mean, it wasn't distinguished, right? Venezuela has that equipment. It can dispose of it or not, correct? It's not distinguished. It was transferred. It's not extinguished. It was just transferred or taken, not transferred, taken by Venezuela. But the right to dispose of that property is now held by Venezuela, PDVSA, right? No. Does PDVSA or Venezuela not have the ability to dispose of that physical property as it chooses? But that's because it- Does it? Yes or no? Yes, the property, the equipment. Right. That right is there. I'm just talking about the separate claim that they have that their right under domestic law to control disposal of these assets, which hasn't been disputed, that right exists under Venezuelan law. The district court said that was extinguished. I don't understand how it was extinguished. It was taken because the right to control that property still exists. It's just now in the hands of Venezuela instead of in the hands of Helmrich. Well, Your Honor, it is disputed what that right to dispose of is because under Venezuelan law, like it is in the United States, ordinary corporate law of all major jurisdictions, it is a voting right. It is the right of the shareholder to vote, but the company still retains ownership and control and the ability, Article 2.4 of the HMP bylaws- No, Sheriff, does Helmrich have a right to vote on how Venezuela disposes of that property? But that's why- Does it, do they have a right to vote on how Venezuela disposes of that property? No. No. No. There we go. Well, Your Honor, then- Venezuela has control over what, how to dispose of that property. The property that belonged to HMP Venezuela, yes. Okay. Your Honor, let me move on to the- Can I try to just come at it slightly differently? It seems like, suppose, just to take some of the factual questions out of the case, focus on what should be the legal test from Helmrich for. Suppose that the Venezuelan government had formally expropriated, the expropriation order that says every asset on the subs balance sheet, everything they own, formally taken, transferred to Venezuela. And, but it's completely silent over, about the rights of the shareholders to vote in directors or whatever, over this thing that now has a zero balance sheet. Would you say that can't support an expropriation claim by the U.S. parent? Well, that isn't what happened here, but I think that- Yes, yes, I understand, Your Honor. I think in that situation, the problem that arises is that you start to run into, well, how much is an indirect expropriation? Is it 100%? I'm stipulating.  I'm trying to get at whether value, taking a value can ever be sufficient without getting, you seem to be saying you can take 100% and that will never be a taking so long as the shareholders have the corporate rights to manage the valueless shell that remains. Well, it's relevant because this court said it was relevant that they have the ability to manage and control the company. And that's why it remanded to the district court for discovery so that we can understand how much they continue to do. Look, I take if we are reading Helmerich IV as if it were a statute, trying to figure out are these independent elements that both have to be satisfied or is this a squishy sliding scale inquiry, that's debatable. But what is the right answer? Why isn't it right to think my hypothetical 100% taking of every asset should be sufficient to support a claim by the parent? Because you have to balance it with the domestic takings rule. The power of a sovereign to dispose of the property of its nationals is embedded in international customary, customary international law. The Supreme Court has recently confirmed that it is an important piece of the expropriation exception. The domestic takings rule has to be abided by. The U.S. government's position in this case when it articulated this test said- But why haven't we abided by that? Because the subsidiary has been dismissed from this case. We're just talking about the parent company, which is not a Venezuelan company. Because under customary international law, Barcelona Attractions, Diallo, it is clear that just taking the value, leaving the company in a near state of bankruptcy, was not enough to establish a taking of the shareholder's right because the company continued to exist. They had the ability to control and manage the- We held it in the core that depriving this parent company of the beneficial and productive value of its ownership interest is a taking. We've already held that. But you still adopted the test from customary international law and Barcelona Attraction. And the decision in Exxon, I think, is also illustrative and informative. When this court looks at what was happening there in SANS, they still have a- They still have shareholder meetings. They still appoint directors. They still have a company that they've registered in the local registry. They're in good standing. And you have a forfeited claim of whether taking all the value wouldn't have been sufficient. We didn't say that was legally not enough. We said that claim wasn't preserved. That is right. But I don't think we can read Exxon differently because if you look at what they said at Exxon, this is- I believe it is page 29 of Exxon. When they're looking at an argument about what the plaintiff, Exxon, in that case said, you know, the United States thinks it's okay to take the property of the subsidiary and you take the value. And the court said it is true that the statute establishing the commission does allow for a valid claim for Exxon, but that statute specifically treats the property, including any right or interest therein, owned wholly or partially directly or indirectly at the time by the national of the United States as what is protected. But then it goes on and says, that's not what's protected under customary international law. That's what's different. That's what Helmrich IV said. And this court also pointed to that distinction when it rejected the notion that we could look to international investment law under bilateral investment treaties that conflate in the definition of investment, the shares with the property of the company. And the United States made that clear in its U.S. amicus brief here in this case, in the last appeal, when it said, when you're looking at an indirect expropriation, you have to make sure that you keep the domestic taking rule in sight. It's not on the property being taken, but the productive value of those shares have been reduced to zero or near zero. And the U.S. government said that would not be enough in their amicus brief. You have to take management and control away as well. The ability and the capacity to produce. But I'd like to move on. Management and control of the business that they had, of their subsidiary's business? The foreign shareholders. Or management and control of the shares? The ownership interest. Yes. Their ability to use the company to pursue whatever other activities they want. And they could. And that's not what has been interfered with here. How could they? The assets are all gone. They continue to do that. The operations are gone. The business is gone. Of H&P Venezuela. But let me move on. But they have an ownership interest. And they have their ownership interest. But let me move on. So they still hold their shares, is your argument. Their shareholder rights. They still own the company. All of the shareholder rights that they have been exercising. Let me move on to the. I know you want to move on. But when the U.S. said in its brief, talked about reducing to zero or near zero, the productive value of those shares. What does that mean? When the U.S. government said that, it said that you had to show something beyond just that the value had been reduced to zero. And that had to be whether the company continues to exist. Because that's what customary international law requires. And that's what Pelmeric IV was articulating, was a test of customary international law. But let me move on to, if I may. One more? Yes. You're trying to ground Pelmeric in international law. Barcelona Traction has the default rule that you state, no doubt. But then it says, different rule if the action is, in some sense, directed at the shareholders. Or shareholders. Just seems like, you know, if the government, back to my hypothetical, a foreign government says, you know, we don't like. We don't like Americans investing in our company. This is an American-owned company. We're just going to take everything they own. That sounds like an action directed at the shareholders. You think international law would shoehorn that into the domestic takings rule? Well, in this case, the Supreme Court looked at precisely whether the discriminatory taking aspect. And said there is no discriminatory taking exception to the domestic takings rule. And the Supreme Court has reaffirmed the importance of the domestic takings rule as part of the international law that is incorporated into the expropriation exception in the Philip case. And that was a critical case in terms of the Supreme Court establishing that under customary international law, which is the only thing incorporated into the expropriation exception. You have to take account of the domestic takings rule. And that's what I would say is the fundamental problem here with affirming the district court's decision on these facts. It's very mushy. It's very abstract. You do not have the requirements that this court articulated in the hemorrhagic floor for a taking under customary international law. But none of this may even be relevant if you look at the district. And you're honest, if I may take another minute, even though I am way beyond my time. If you have one more sentence. Yes. I want to say all of this also just goes away with the ruling that the district court said in terms of whether the PDVSA defendants are alter egos of the republic. Under BANSEC, which is the test that is used to determine whether you're an agency or instrumentality or a foreign state under the FSIA, once you become adjudicated to be the alter ego of the state, you are the state. And therefore, the first prong of the commercial nexus clause would have to apply. The property is not in the United States. And although we don't believe the PDVSA defendants, but it has been established in this case that the PDVSA defendants are alter egos of the republic. If the court were to agree and sidestep personal jurisdiction and due process, then you would come squarely back into the first prong of the commercial nexus requirement. And the case would have to be knocked out because the property is not here, which is the same reason the act of state doctrine also knocks out the case. Thank you. We did keep you up a long time. We will be done very well. Thank you very much. Thank you, Your Honors. And may it please the court. Matthew Rosen, Gibson Dunn for Plaintiff Appellee, Helmholtz & Payne International Drilling Company. This court in Helmholtz 4 said that our complaint fled an indirect expropriation to a T. Judge Cooper then found that we proved the allegations in our complaint, so he correctly denied PDVSA's motion to dismiss. This court is focused on subject matter jurisdiction, so I will start there and focus there, but I'm happy to discuss any other issues that the court wants to discuss. The arguments that PDVSA has made today are the same arguments that it made and lost in Helmholtz 4. It's arguing that if the company still exists, there is no indirect expropriation. Well, the company still existed. That was patently obvious in Helmholtz 4 in a technical sense because Helmholtz & Payne Venezuela was a party in this court, and that didn't stop the court from finding that we had pleaded an indirect expropriation to a T. Our statement of the rule in Helmholtz 4 seems to require taking the management and control rights as well as taking all the value. Yes, so what the court said is when a state permanently takes over management and control of a foreign shareholder's business, the focus is on control of the business, not control of the shares. If it were on control of the shares, there would be no suspended indirect takings. And here, there's no question that the business is a drilling business, and that drilling business has been taken by PDVSA. We do not control that at all. The only management and the only board activities that are in the record are winding down the company. There's three board resolutions in the record. Two of them concern authorizing the few remaining employees to engage with the agencies of the Venezuelan government and the utility companies for the purpose of shutting down the company. And the third is just accounting measures to account for the expropriation. So there's no management and control of the company, and there's no question that the company has no value left. I will respond to a couple of the points that my opponent made. First of all, there were some questions about what permanent deprivation of control means. That is resolved by the international law cases that we cite in our brief, the government's brief in the Electronica Cicula case and the 1985 CEDCO case. They both clarify that the standard here is when there is no reasonable prospect of regaining control. That's clearly the case. No one thinks that the Venezuelan government is going to give us back any aspect of our business. So that's easily satisfied. My opponent also referenced a couple of international law decisions, the Barcelona Traction decision and the Diallo decision. Neither of those decisions are helpful to PDVSA at all. The Barcelona Traction decision, there's a brief mention of the indirect expropriation theory in paragraph 48 of that decision. And the court goes on to say, actually, the Belgian government has not raised that theory, so we're not going to address it. The rest of the decision is discussing a completely different theory, which is more of a shareholder derivative claim or an alter ego claim in the event that there isn't a liability. And also, Barcelona Traction and LIGHTS does not involve any of the facts that are relevant to the standard under Helmholtz 4. Government of Spain did not take the company. The company had not been deprived of value. Paragraph 67 makes clear that the shares still had value in that case. Similarly with Diallo. Diallo is a case where the plaintiff alleged that he had been imprisoned and then kicked out of the Democratic Republic of Congo. And as a result, his shares, his company had declined in value. There's no allegation, Diallo, that the company had lost all value, not by the plaintiff at least. And there's no allegation that the Democratic Republic of Congo had taken over control of that company in that case. Do you have any international cases to affirmatively support the proposition that taking 100 percent of the value is sufficient without getting into all this other business about management rights? Yes, I think the Clorox case, which is an international treaty arbitration case, applying international law expressly in that case. There is no taking over the management control. There's just actions by the Venezuelan government that completely destroyed the value. It's a Clorox, you said? Clorox, yes. Is that in the briefs? It is cited in the briefs. And it also, that case also. You said it was a treaty case, but was that an investment treaty case? It was an investment treaty case, but it is clear in the decision that it is not in the passage that we're discussing talking about what the treaty says. It's talking about basic principles of international law. There's several express references to customary international law. And this court considered two treaty arbitration cases in Calumar IV, Tidewater and Fopenthalda, and relied on those decisions to consider international law where relevant and where the cases were actually discussing that issue. So it seems that the jurisdictional inquiry really relies on two different aspects. One is property taken in violation of international law. And the second is, for our purposes, owned or operated by an agency or instrumentality. And it seems to me that Calumar IV was really addressing that first part, taken in violation of international law, and didn't really speak to owned or operated by an agency. And it wasn't clear to me that to meet the second part, which is also necessary, owned and operated, that the value, the productive value and beneficial use, that aspect of it, definitely relevant to taken in violation of international law, because it's just taking away all the shares, depriving of its value. But owning or operating by an agency doesn't seem – it doesn't seem like you can fulfill that second part of this just by reducing value. You actually have to own and operate. And I think that it's probably met, because if you take over the ownership interest and start doing things with subsidiary, it seems that you've taken it over. But the analysis that relied on reducing value, to me, didn't really seem to support owned or operated by an agency. Your Honor is correct that the decision did not directly address the issue of owned and operated, but I think it's quite instructive, because the key premise, the Calumar IV decision, is the word equivalent. The idea is that when you meet this standard, when you've taken management and control and destroyed the beneficial and productive value of the company, that is the equivalent under international law of taking the shares. So that means that those – So if you think any time you've taken the shares, then you've owned. It's owned or operated. I think – Is that sufficient? I think if you are running the business, that is the equivalent of taking the shares. So you own – The business has to continue. The business has to continue. So in the – Okay, if some foreign company came in and just took it and said, this is an evil business that's contrary to the interests of our people, and just shut it down and didn't operate it then. Right. The value of the shares is now zero. Right. If they blew up the drilling rigs, then they're not owning and operating. And that would be, for example, the Evanenko case, where the property was actually physically destroyed. But here, the property, the relevant property that's the equivalent to the shares is the – So you would apply the statutory test to any time the shares are taken and the business is still ongoing and the test is met? Regardless of whether the shares are technically taken, if the business is taken as being operated, that is sufficient. That's the equivalent of taking the shares. We're talking on shares because we are talking about the parent company, not the subsidiary company. We can't talk about the subsidiary company because it's a domestic taking clause. So it has to be the shares. It has to be the ownership interest of the parent company. I think it has to be the equivalent of the shares. And the business is the equivalent of the shares, right? That's the premise of Albert IV. So when you've taken – That's where things get squishy. And that's what your friend in the side was trying to get at. It can't just be taking the business because then you run into the domestic takings problem. It has to be taking the parent company's ownership interest in the subsidiary. And Albert IV says those shares, if you reduce the beneficial productive value to zero, you've taken them, the shares, the ownership interest of the parent company. And my question is, if you've taken them and the business is still ongoing, then you are owning and operating them. Is that correct? That's right. Exactly. If you have taken over management and control of the business, and you are exercising management control of the business, and you have completely destroyed the beneficial and productive value of the ownership of the company for the shareholder, and you are reaping all of the beneficial and productive value of the company, then you have taken the shares. You have engaged in an indirect appropriation. You have two taking theories. If we agree with you on the first, ownership, both the taking and the own and operate, do we need to reach the second? Would there be any consequence for damages? No, I don't think you need to reach the second. Do you want to address Republic of Hungary versus Simon Springford's recent decision, that one, because your friend on the other side? Absolutely. Great value for their argument. Yes. So we didn't fight that decision because it's completely irrelevant to this case. The Simon decision is not construing the second Tinker Looper Amendment. It is construing a provision of the expropriation exception that is not an issue in this case. There's two paths to jurisdictional nexus under the expropriation exception. One is whether the property is present in the U.S., but even if it's not, there's a second prong which we're relying on here, which is the property is in the hands of an agency and instrumentality that is engaged in commercial activity. Simon was construing the present in the U.S. prong, and in fact, it makes clear that that requirement, and this is on page 488 of the decision, that requirement is stricter than anything in the second Tinker Looper Amendment, which is exactly our point. There is no jurisdictional nexus requirement in the second Tinker Looper Amendment. It doesn't require the property to be present in the U.S. It's actually helpful to us, certainly not harmful. You're pressing the merits. You wanted to say a word on jurisdiction, on active state. Sure, yeah. So, this case falls squarely within the second Tinker Looper Amendment. The amendment applies whenever there is a case in which a claim for title or property rights is asserted. There's no question. No, I'm sorry, pending appellate jurisdiction. Oh, on jurisdiction, yes. So, right, we agree that the issues are not inextricably intertwined. Are not. Are not inextricably intertwined. I mean, it's a tough standard for an appellate, but, I mean, the storyline here from Sabatino to Tinker Looper to 160583, I mean, it's just one, it's one continuous story. You have similar text. You have arguments about meaningful variation. You have arguments about history. I mean, these seem to be very intertwined. Yeah, I mean, there are some connections between the issues, and we'd be content for the court to reach the issue. We think we'll either win it now or we'll win it later. Is the violation of international law inquiry the same under both FSI? I know there's the also nexus requirement for jurisdiction, commercial nexus if there is an under active state for Hick and Looper Amendment, but the court question of whether taking those in violation of international law, is there any difference between those two? I don't think there's any difference. So, it's actually the same question. I think that part of the question is the same question. So, the only other thing that the jurisdictional inquiry asks is the relevant commercial nexus, depending on whether you're saying the sovereign or agency or instrumentality. That's correct. Okay. And why wouldn't, you know, we're in a unique area here for penitent jurisdiction because there is, we're told time and time again that we're supposed to resolve these questions, threshold questions, whether the foreign sovereign should be in court or not as early as possible. We are already pretty far past early in this case, but why wouldn't exercises of penitent jurisdiction, at least in the unique context of the Foreign Sovereign Immunity Act, favor reviewing closely intertwined legal questions together at the threshold because that's the thrust of our role in the foreign sovereign. Yeah, I think that's reasonable. And again, we don't really have an objection to the court reaching the merits of the active state doctrine. We were relying on the Helmerick II decision, but if the court thinks that that's distinguishable, we're content to decide the merits of the issue either now or later. On personal jurisdiction, I'm not so much interested in sufficiency on the fact check factors, but on the inconsistency point, what's your, if we apply those factors to establish altered ego status, doesn't that make the punitive agency or instrumentality into the foreign sovereign itself? It doesn't. Because that gives you a tougher standard on subject matter. It doesn't because this court made clear in TMR that these are separate tests. And the test established in Trans-Ero is not a test that's rooted in corporate principles. It's rooted in the restrictive theory of sovereign immunity, which distinguishes entities engaged in commercial activities from entities engaged in governmental function. That's what the court is looking at when it determines whether a suit is brought by an agency or instrumentality. So the band check test, which is really a corporate principles test for when you disregard the corporate form, is not really relevant to that threshold. I might be misremembering. I thought it was a loss imposed by the Supreme Court for the precise purpose of distinguishing between the foreign sovereign and the agency or instrumentality for FSIA purposes. Band check does not frame the issue in terms of whether something is an agency or instrumentality under the FSIA or not. That's not the question in the case. The question is really can, I believe it was whether a Cuban entity could be subject to a counterclaim based on an action of a different Cuban entity.  Okay. Can you be an agency or instrumentality under the FSIA and not be an alter ego of the state? Can you be an agency or instrumentality and not be? Yes, I mean, most corporate entities would be agencies and instrumentalities and not alter egos. I think the question here is can you be an alter ego? No, I'm just trying to understand the universe of agency or instrumentality because at some level its definition suggests a level of control by the sovereign that one might say would make it an alter ego. It might have a corporate form, but still we disregard the corporate form for purposes of alter ego inquiry. I think in the typical case, if you have a not closely run foreign company, in that situation, they would be, you'd look to the core function test to see if they're an agency or instrumentality. So if they're primarily engaged in commercial activity, they're an agency or instrumentality. Nonetheless, many of those companies are not closely held. So when you have here where it is so tightly held, it is one and the same as the sovereign. Why doesn't a determination up front at the jurisdictional stage that the company here is the alter ego mean that we dismiss? Just as we would, I have two questions. Why don't we just dismiss like we have to with the sovereign itself? Or two, why doesn't this make this case, like Simon versus Republic of Hungary, a suit against the sovereign itself for a taking as opposed to an agency? Right, because the test is the same as the state. The test that this court established in TransAero to interpret the term agency or instrumentality is a completely separate test from the alter ego test. It's looking to the concept of the restrictive theory of sovereign immunity. When Congress established the Foreign Sovereign Immunities Act, its goal was to treat entities- I'm just trying to see if it makes sense. Maybe we're bound by it as a panel, but I'm trying to understand how it makes sense. If there's a large world of agency or instrumentality that aren't alter egos, then we don't have to adopt that type of reading to keep the statute functioning. The agency or instrumentality provision to have a role under the statute. It can just apply whenever it's not an alter ego. But if you said it's an alter ego, it would seem to me it's an alter ego full stop. When you find that they're the alter ego, you dismiss them. It was weird here to say they're the alter ego, and so, therefore, they don't get minimum contact under personal jurisdiction. We didn't then just say, well, it's Venezuela. We need to dismiss. Right, because the Congress, when they established the Foreign Sovereign Immunities Act, was trying to establish a regime in which engaging in commercial activity is treated differently than engaging in governmental function. So, when a foreign state is operating through an alter ego that is primarily engaged in commerce, as long as the control is sufficient, you establish you're not a person for purposes of due process. But Congress's judgment was that that kind of entity should be treated differently for purposes of service of process, punitive damages. The commercial nexus requirement differs depending on whether you assume the sovereign directly or an agency or instrumentality. It seems like there's a bit of picking and choosing going on here because we want to say it is both the sovereign and an agency or instrumentality. And so, how do we know which of the approaches to the commercial nexus? Do you all have to show that the property they've taken from you is now being operated or in the United States? No, we don't because PEDAVASA and PEDAVASA Petroleum still meet the test for agency and instrumentality. They meet both tests. They meet both tests. But they're also the sovereign itself. So, how do we know which commercial nexus requirement to apply? Well, because they are an agency and instrumentality for statutory purposes. They're also the sovereign itself. Not for statutory purposes. Under the statute there, there's a separate test for how you determine whether something is an agency or instrumentality. I understand that there's a separate statutory definition of it. But I don't think that answers what the statute says to do when something may meet that test but is also in fact the state itself. It's not in fact the state itself. The alter ego test is an equitable inquiry that the court is applying so that a foreign state can't benefit from its disregard of the corporate form. I'm sorry. The statutory structure is set up to afford an extra degree of protection to the sovereign itself as opposed to the agency or instrumentality. So, if we're in this odd circumstance where, at least for some purposes and in some intuitive sense, this agency or instrumentality really is the foreign sovereign, why wouldn't it be treated as such for FSIA purposes? Well, it's not that in some metaphysical sense it really is the foreign sovereign. When you do an alter ego analysis, what you're saying is that the foreign state has disregarded the corporate formalities. And so it cannot claim the benefits of identifying the entities separate for purposes here of due process. It doesn't follow that the entity is therefore a foreign state proper and not an agency or instrumentality under the test. And if you look at the reasoning of TransAero, it kind of confirms this. One of the key factors that the TransAero focused on was administrability. Whether something is an agency or an instrumentality is something that needs to be determinable early in the case because you have to serve process affects how you serve process. And so, for example, in the ESSO case in the Second Circuit, you have an entity that was served under 1608B, the Nigerian National Petroleum Company. It was only served in a manner that would only apply if it was an agency or instrumentality. And later in the case, an alter ego showing was made to deal with this exact due process problem. And the court didn't say, now you have to go back and redo service. I looked at Bandcheck. Your characterization of it is right. And one can imagine that there are different tests for different purposes. This does have a little bit of a one-way ratchet flavor to it where we're treating the instrumentality as different from the state for purposes that help you, but only for those purposes. But I think that's consistent with Congress's intent because you have to keep in mind that this was a statute in which Congress intended to extend personal jurisdiction to the farthest reach possible. 1330B says if you establish subject matter jurisdiction under any of these prongs, then you have established personal jurisdiction. And so I don't think Congress would have wanted some external additional obligation under the due process clause that Congress didn't even believe was in place to put pressure on the subject matter jurisdiction prongs that it has established by altering the test for whether something costs them. The due process isn't some external thing for all the agencies and instrumentalities that are not alter egos. Don't you have to establish them in the context of them? That's true, but I think what I'm- Congress wasn't saying we don't want to, even assuming it could, we don't want to deal with that due process here. The question is- I think the point is- You are a sovereign. I think the point is- Yes, you are a sovereign. But then when we turn to applying the statute to you, we say actually you're not really a sovereign. I think that Congress wanted to extend personal jurisdiction to the farthest reach possible and wanted to extend the ability to sue to the kind of circumstances in this case. If you just read the statute, it's clear that when you have a foreign state, a commercial entity that's engaged in commercial activity is its primary function. Congress wanted to treat that as an agency or instrumentality. Congress wanted that entity to be able to satisfy the second prong of the expropriation exception where the property doesn't have to be present in the U.S. And Congress wanted that entity to be subject to personal jurisdiction. So the idea that there's an additional requirement for due process would require an alter ego standard that would nonetheless take that entity out of the Foreign Sovereign Immunities Act. I don't think that's what Congress intended here. Although we use the term alter ego, it seems to me that what we're saying to meet that test is sufficient that the company or entity is an agent of the country, not necessarily that it is the country. Is that an important distinction? Yes, that's a very good point. So under the Transamerica's decision, there's a two-part, really three-part test for alter ego, right? You can either have the agency prong or the fraud and injustice prong. And then under the agency prong, you can either have alter ego or traditional agency principles. And I think traditional agency principles would be sufficient here to establish that because PEDAVASIS is operating as an agent of the state, they're not subject to the due process. So we're not trying to reconcile that with the FSIA standard. We're not saying you are the country. We're saying you're the agent of the country. That's a very good point. The phrase is agency or instrumentality. And you just said that there's all kinds of agencies or instrumentalities that are not alter egos. Yes, and the court has said that there are all sorts of agencies and instrumentalities that are not operating as an agent of the foreign government. I mean, maybe part of that is because of the word instrumentality. But not every corporation that's owned by a foreign state is acting as an agent of that foreign state. Here they are because of the complete control that Venezuela exercises over them. What does instrumentality mean distinct from agency? I don't know. It might be one of those terms like arbitrary capricious. It's sort of a term of ours. Well, you just said not everyone's an agency. Right. An agent. So my point is that if you were to read agency as necessarily inherently implying the kind of agency relationship that would establish, would make ban check apply and get you out of the due process clause, then you would have to give instrumentality a different meaning as a commercial entity that is not. Can you satisfy minimum context here? We certainly argued that below. We haven't argued it in this court. If you were to conclude that we needed to establish minimum context. It would make it a lot easier than having to have your cake and eat it, too. Right. The other factor here is that the Supreme Court in full is currently deciding whether there is a separate minimum context. The argument, I don't think that wasn't even a sovereign. I mean, there's enormous barriers to deciding whether the Palestinian Authority is a sovereign to begin with. So it seems highly unlikely they're actually going to write that issue. The premise of this court's decision that requires us in this case to meet the traditional 14th Amendment. Minimum context test is the live not decision, which holds that the Fifth Amendment's due process standard is identical to the 14th Amendment. So if the Supreme Court were to hold, no, they're not identical. I think all bets are off. We can relitigate that issue. So the distinction between agency and agent. I mean, I'm just looking at 1603A. I mean, there have been cases where the agency is actually an agency of the government. None. There's a difference between an agent for like a principal and an agent and an agency. And I'm just wondering if agency just means literally an agency of the foreign state, like a government agency. Well, I don't think it can because traditional government agencies like the Treasury or the Department of Health and Human Services, those would all qualify as the foreign state proper and not agencies and instrumentalities under the test. Right. Yeah, exactly. The Bolivian military. Do you think an agency is an agent? I think one possible reading of that term, if you think agency and instrumentality have distinct meaning, is that agency refers to agents that meet traditional agency principles and are not separate commercial entities. And instrumentality refers to... Just say agent if they meant agent. Perhaps. Okay. Yeah, thank you. All right. Do you want to just take one minute? Do you have more? Thank you. Yeah, we would ask the court to affirm the decision to deny Pettibase's motion to dismiss. Thank you. All right, Mr. Perlow, we will give you three minutes for rebuttal. Thank you, Your Honor. I'd like to hit three points. I just want to close the issue on the appropriation exception with Judge Payne's observation about the owned or operated prong. I do think that that is what gets squishy. And the answer that my friend gave was, well, ownership is the business. And then the district court and HMPA DC also go further and say, and the business is the assets. And that does away with the entire distinction between shareholder and company. And I think that that is the fundamental problem with the district court decision there. The Clorox decision doesn't help them at all because it is dealing with an investment treaty arbitration. Again, it highlights the problem of bringing in this body of law under customary international law. Because if you look at the Clorox decision, paragraphs 670 to 700, or 670 and 700, you can see that the court, that the tribunal there is disregarding the distinction between the company and the property because the investment is the whole thing under the treaty. And that is the risk that is being run here in this case, as opposed to Helmreich IV, where the test was articulated at the pleading stage. Because now we know that the evidence shows that what happened was, what is being established here under the owner-operated prong is that the assets, the assets are being used to produce and drill, and therefore that equates to the business, and the business equates to the ownership. That we don't think is possible to do under customary international law or Helmreich IV. Now, on the point about the agency or instrumentality and alter ego, the argument that my friends make doesn't add up because BANSEC has been applied by multiple courts, including this court, to analyze the sovereign immunity provisions of the FSIA. Under the commercial activity exception, you can attribute the acts of an agency or instrumentality to the state if you establish that there are alter egos under BANSEC. The decision that they rely on in – What's wrong with thinking about this? The FSIA says if you set up – the foreign state sets up a separate agency, formally separate agency as opposed to the state itself, that entity or subject matter jurisdiction purposes gets an extra level of protection, right? And you've done that, and we are respecting that insofar as we're applying the commercial nexus standard for agency or instrumentality. But none of that has anything to do with this question, which is, you know, what is – what kinds of entities get due process protection? Or with BANSEC, which is a substantive international standard for bail piercing? Well, they are interrelated because BANSEC has been used not only for the substantive bail piercing aspect but also for subject matter jurisdiction, and it's also used for personal jurisdiction. It's the same test, TMR, Transamerica. Transamerica is using BANSEC to attribute acts of agency or instrumentality to the state. It's using BANSEC. So you have the same test that cuts across all of these different analyses because what they're trying to get at is, do you have a separate legal person? And the Gator Assets case is a great case from the Second Circuit to look at explaining how BANSEC and the separate legal personhood requirement of the FSIA are bound up, including BANSEC that looked to the FSIA for this presumption of separateness. So I think, Your Honor, Judge Millett, your observations were correct that once you say that under BANSEC you're the state for due process purposes, you're the state. That's the conclusion that has been arrived at. And I don't know that the – Are we not bound by our Trans-Ero issue? Because – Trans-Ero issue, which simply said can be alter ego of the state for purposes of a due process cause but not for purposes of agency or instrumentality. That's not what Trans-Ero, respectfully, Your Honor, held. Trans-Ero dealt only with BANSEC at the personal jurisdiction stage. There was no contested fact about whether the fund there was an agency or instrumentality for purposes of service of process. So that was just – it was presumed to be separate and it was treated separately, and then the separateness was challenged. Once the separateness was challenged, there is no case that then treats the alter ego as, once again, a separate entity under the FSIA. Do you object to service of process in PDBSA as insufficient? It wasn't completed in the manner in which you have to service that? No, Your Honor. We think we're separate. We think we're an agency or instrumentality and, therefore, entitled to due process under the due process clause. And minimum context has not been established and could not be established, and that is why they're trying to get around due process by alleging alter ego, but they run up against this problem that once they establish alter ego for purposes of deciding that you are the state, you're the sovereign, then you have to be kicked out under the first clause. For agency instrumentality, at least for the commercial nexus purpose, you have to be engaging in economic activities in the United States. Reference here, the CITGO operation. You don't dispute that, right? Why can't that be the source of minimum context? Well, first of all, under the Daimler decision, to have general jurisdiction to bring a claim generally, you need to be either incorporated here or have your principal place of business here, and PDBSA is not incorporated here and does not have its principal place of business here. And for specific jurisdiction, you need to have some kind of connection in arising or related to connection between the contact and the claim, and there is absolutely no connection that has been established or could be established between whatever commercial activities are found to be attributable to PDBSA in the United States and the taking of HMP Venezuela's rigs in Venezuela. There is no assertion or any evidence showing that the property has found its way into the United States or any property exchange for that property. The district court here has already dismissed the republic from this case because it found that the property was outside the United States. And I'd like to conclude on this, on the point of this active state doctrine, because I think this is all of a piece. The Supreme Court in Simon, I think, has left no doubt that, and you heard my friend say that the Supreme Court in Simon was focused on the prong about whether the property was in the United States. That was the focus of the expropriation exception analysis in Simon. And to inform that analysis, it went to the history of San Batino. It went to the history of the second Hickenlooper Amendment because all that was being addressed in that set of circumstances was a claim to ownership rights in proceeds in New York, and that is what Congress was concerned about. It textually indicated so by using the language claim of title or other ownership interest, which is exactly like what the Supreme Court analyzed in Dole under Section 1603B2, shares or other ownership interest, and said the other ownership interest had to be direct like shares. The other property rights here have to be ownership rights like claim of title, and that can only be adjudicated by a U.S. court if the property is in the United States. With that, Your Honor, I will conclude. Thank you very much. The case is submitted.
judges: Millett; Katsas; Pan